AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: s/Nick Coffey 2/21/24

# UNITED STATES DISTRICT COURT
### for the
Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Premises known as 701 SE 29th Street, Oklahoma City,<br>Oklahoma 73129, the surrounding curtilage, and<br>any vehicles, garages, and outbuildings thereon | )<br>)<br>)<br>)<br>)<br>) Case No. M-24- 167 -SM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Western _____ District of _____ Oklahoma _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841 | Distribution of a Controlled Substance |

The application is based on these facts:

☑ Continued on the attached sheet.

☑ Delayed notice of 90 days (give exact ending date if more than 30 days: 05/22/2024 ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Adams, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Feb 22, 2024

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

Suzanne Mitchell, U.S. Magistrate Judge
*Printed name and title*

## WESTERN DISTRICT OF OKLAHOMA
## OKLAHOMA CITY, OKLAHOMA

STATE OF OKLAHOMA     )
                       )
COUNTY OF OKLAHOMA   )

### AFFIDAVIT

I, Michael Adams, Special Agent with the Federal Bureau of Investigation (FBI), having been duly sworn, depose and state as follows:

1.     I have been a Special Agent with the FBI since March 2015. I am currently assigned to the Oklahoma City Division, where I am assigned to the Criminal Enterprise Squad, which is responsible for investigating, among other things, the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. Through my training and experience, I have become familiar with the methods and operation of drug distributors, including their common organizational structures, use of violence, methods of manufacturing, distributing, storing, and transporting drugs, and methods of collecting and laundering drug proceeds. As part of my investigative experience as an FBI Special Agent, I have been the affiant in multiple Title III wire intercept affidavits, executed search and arrest warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

2.     The facts set forth below are based upon my own personal observations, reports and information provided to me, other documents obtained during the course of this

1

investigation.   All of the below-described dates and times are approximate.

3.    The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure a search warrant for 701 SE 29th Street, Oklahoma City, Oklahoma 73129 (the **Subject Property**), as described further in **Attachment A** (physical description) for evidence of violations of 21 U.S.C. § 841(a)(1) (manufacturing, possessing, distributing and selling of controlled substances) and 21 U.S.C. § 846 (drug conspiracy), as described further in **Attachment B** (description of items to be seized). Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrant.

## BACKGROUND REGARDING DRUG CASES

4.    As discussed previously, based on my training, experience, and consultation with other seasoned drug investigators, I am familiar with the *modus operandi* of drug traffickers. Based on my training and experience, as well as my participation in numerous drug-related investigations, I know the following:

a)    I am aware that drug dealers frequently keep assets, records, and documents related to their drug distribution organizations, and monies derived from the sale of illegal drugs, in their own residences, businesses, as well as in safe houses where they are not easily detectable by law enforcement officials conducting investigations. Further, I am aware that these individuals will frequently maintain these houses in the name of other individuals, also to avoid detection by law enforcement agencies;

b)    I am aware that even though relevant assets, telephones, and properties are often

2

held in alias or third-party names, drug dealers continue to use and exercise dominion and control over them;

c)      I am aware that drug dealers often maintain on-hand quantities of currency and drugs in order to finance their ongoing drug business;

d)      I am aware that drug dealers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances, even though such documents may be in code.  It is particularly common that individuals engaged in drug trafficking will keep ledgers related to their illegal activity because drug dealers commonly "front" drugs (provide controlled substances on consignment) to their clients, and are frequently "fronted" drugs by their own sources of supply as part of their dealing operations;

e)      I am aware that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug dealers have ready access to them, i.e., homes, automobiles, businesses and safe houses;

f)      I am aware that drug dealers will frequently keep records, notes, ledgers, contact lists, and other evidence of their drug trafficking on digital devices (i.e. cellphones, computers, tablets, etc.) and that they often keep such digital devices, particularly cellphones, on their person or on the premises that they control.  Further, I am aware that drug dealers will often have multiple digital devices, and will frequently use more than one digital device to help conduct their drug trafficking.   I am also aware that drug dealers will use these digital devices to further their drug trafficking through the use of digital communication, including, but not limited to, e-mail, calls, and instant

3

messaging. Further, I am aware that drug dealers will attempt to conceal the information on their digital devices that is relevant to their criminal activities through the use of encrypted applications (i.e. WhatsApp, Signal, Silent Phone) and security locks on their devices;

g)      I am aware that it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions, drug sources and drug customers, in secure locations within residences, garages, storage building, safes, and safety deposit boxes for ready access, and also to conceal such items from law enforcement agencies;

h)      I am aware that when drug dealers acquire large sums of proceeds from the sale of drugs, they attempt to legitimize their profits;

i)      I am aware that to accomplish these goals, drug dealers utilize, among other things, banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations, and business fronts;

j)      I am aware that drug dealers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the drug dealers organization, even if said items may be in code;

k)      I am aware that drug dealers commonly take photographs (or cause photographs to be taken) of themselves, their associates, their property and their products, and that these dealers usually maintain these photographs in their possession and at their residence; and

4

l)      I am aware that firearms are commonly used by drug dealers to protect their

inventory and currency.

**PROBABLE CAUSE**

5.      Law enforcement first became aware of Oscar Hernandez (Hernandez) and the

drug trafficking organization (the "DTO") described herein in 2018 during an investigation

targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs

across the state of Oklahoma and beyond.   During the investigation, which utilized Title III

wiretaps, law enforcement intercepted Hernandez and identified him as one of the IMG's

principal sources of supply of methamphetamine (meth).   These IMG members and their

associates were ultimately indicted and convicted.   *See United States v. Velasquez*, CR-18-

260-SLP.   Next, from roughly 2019 to 2021, law enforcement began targeting Hernandez's

distribution network.   During that portion of the investigation ("Phase 1") investigators

uncovered a massive meth distribution network led by Hernandez.

6.      Phase 1 established that Hernandez, who was residing in San Luis Potosi,

Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-

day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of

meth to customers of the DTO and collected millions of dollars in drug proceeds—all at

Hernandez's direction.   Prior to that distribution, the crystal meth was converted from its liquid

form at multiple clandestine laboratories in rural Oklahoma. While these labs were owned by

Hernandez's family members and co-conspirators, the individuals that worked at the labs

(hereafter referred to as the "lab workers") appeared to report to the ultimate source of supply,

whom cooperators identified as "Mamisan".   Law enforcement also found evidence indicating

"Mamisan" was the individual responsible for coordinating the shipments of liquid meth from the U.S.-Mexico border to Oklahoma; the investigation established that the meth was being transported in the fuel tanks of a semi-truck, which was owned by and registered to a company called DGC Express. DGC Express, in turn, listed its registered agent as Nelly Gutierrez (Nelly), according to the Texas office of the comptroller. Once the semi-truck arrived in Oklahoma, it was received by the lab workers at a private location, where the liquid methamphetamine could be extracted, placed into transportable containers, and ultimately taken to the clandestine lab location for conversion.

7.    As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including Hernandez (*see United States v. Hernandez*, CR-21-76-SLP), members of his incarcerated customer base (*see United States v. Baswell*, CR-21-77-SLP), and two truck drivers (*see United States v. Cedillo*, CR-21-288-SLP, and *United States v. Lucio*, CR-21-289-SLP). In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery location and two clandestine labs used by the DTO. Law enforcement also made significant drug and money seizures, including over one thousand pounds of methamphetamine and more than $1 million in U.S. currency. At the time, this coordinated effort significantly disrupted Hernandez's and the overall DTO's operation. It was not until the fall of 2022, however—with the help of a newly developed confidential human source (CS1)[1]—that law enforcement

---

[1]    CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1

launched the second phase of the investigation into the DTO described herein.

8.    Since phase two of the investigation launched, law enforcement has identified

the same organization, albeit with some new players, continuing to function using virtually the

same *modus operandi.*

9.    For example, law enforcement first identified the **Subject Property** in May 2023

as one of the private locations used by the DTO for receiving shipments of liquid meth from

semi-trucks.  On May 10, 2023, a black 2015 Cascadia Freightliner bearing Texas tag R65-

9752 (the "black semi-truck"), with no trailer attached, arrived to the **Subject Property** and

pulled into one of the garage bay doors and the door closed behind it.  The truck stayed for

approximately ten minutes.  Based off of the previous multi-year investigation, law

enforcement suspected the black semi-truck had delivered meth.  Additional investigation into

the black semi-truck further convinced investigators of this; the black semi-truck was issued to

Dare Express LLC at 1111 Champion Drive, Donna, Texas.  According to the Texas Office of

the Comptroller, Dare Express LLC's registered Agent is Denis Gutierrez (Denis) and has a

registered office address of 6514 E Texas Rd., Edinburg, Texas.  Denis, along with his

suspected wife Nelly, was a signatory on a Chase bank account associated to DGC Express

_____

furnished information to law enforcement in hopes of receiving consideration for his/her
most recent pending charges. CS1 has also received $1,000 in monetary compensation to
date for his/her cooperation. The information provided by CS1 has been corroborated
through other investigative techniques including physical surveillance, consensually
recorded conversations, and telephone analysis.  Information provided by CS1 has been
reliable and I am unaware of any knowingly false information furnished by CS1.
Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through
his/her personal observations or conversations with targets of this investigation and their
associates.

LLC—the same company operating the semi-trucks delivering liquid meth to Oklahoma City in 2021 as described previously.

10.     Following this apparent delivery on May 10, 2023, law enforcement saw the black-semi truck return to the **Subject Property** on May 21, 2023, June 7, 2023, July 7, 2023, and July 11, 2023.  Each time, the truck stayed for a short amount of time, suggesting to investigators that these too were deliveries of liquid meth.  On September 21, 2023, United States District Judge Jodi W. Dishman for the Western District of Oklahoma, issued two orders—the first authorizing the interception of oral communications, and the second authorizing the monitoring and recording of visual, non-verbal conduct inside the **Subject Property**.  Law enforcement monitored activity inside for a total of 87 days.[2]  During that time, law enforcement was able to observe three deliveries in real time as they occurred on November 10, November 17, and December 6.

11.     On all three occasions, the black semi-truck pulled into the large middle garage bay of the **Subject Property**. Once inside, two individuals—Edgar Rodriguez Ontiveros (Rodriguez) and Jose Equihua (Equihua)—extracted the liquid meth from inside the passenger side fuel tank of the black semi-truck into a large IBC tank housed inside of a black, pull-behind trailer.  DTO members later transported the black, pull-behind trailer with the meth to the

---

[2]     Law enforcement received two additional bug and/or CCTV authorizations for the 29th St. warehouse after this initial round.  First, on October 20, 2023, United States District Judge Scott L. Palk authorized the continued monitoring and recording of visual, non-verbal conduct inside the warehouse.  Then, on November 17, 2023, United States District Judge Jodi W. Dishman authorized the renewed interception of oral communications and the continued monitoring and recording of visual, non-verbal conduct inside the same location.

DTO's clandestine conversion lab at 980801 S Stage Coach Drive, Wellston, Oklahoma (Wellston lab).   At the time, law enforcement believed that the Wellston lab, a rural, five-acre property with both a residence and a detached garage, was serving as the DTO's principal conversion lab.

12.    Two days after the December 6 delivery at the **Subject Property**, law enforcement executed a search warrant at the Wellston lab, confirming it was as suspected a methamphetamine conversion lab.   Law enforcement found a fully functioning meth conversion lab, recovered more than 1000 lbs. of liquid and crystal meth[3], and arrested both Rodriguez and Equihua on site.

13.    In order to monitor activity inside the **Subject Property**, law enforcement also applied for and received authorization to search the **Subject Property** in conjunction with executing its bug and CCTV authorizations. (*See* M-23-810-SM.)   This search consisted of the installation of audio/video recording equipment used to monitor the activity inside, as well as a covert search of the premises in which photographs and digital forensic copies were made so as to not alert the target(s) of the investigation that a search was executed.   During the search and pursuant to authorization in the search warrant, law enforcement took photos of meth lab materials found inside the **Subject Property**, such as propane tanks and containers of acetone. Law enforcement also made a partial clone of a 4 TB hard drive within the **Subject Property's** system.

14.    Although the DTO does not appear to have used the **Subject Property** for a

---

3       Field tests resulted in presumptive positives, but official results from the DEA lab in Dallas, Texas are still pending.

meth delivery since December 6, 2023, law enforcement is requesting the authorization sought herein in order to (1) retrieve the previously installed equipment, and (2) recover any additional evidence of violations of a drug conspiracy.   At the very least, your affiant believes the hard drive previously exploited likely remains inside the **Subject Property** and certainly contains additional evidence not previously acquired in the September 22, 2023 search warrant. In fact, after reviewing the evidence collected from the previous extraction, law enforcement found footage from inside the **Subject Property** from apparent liquid meth deliveries pre-dating the eighty-seven day period in which the inside of the **Subject Property** was being monitored pursuant to the Court's CCTV authorization.   I also believe that the **Subject Property** will likely contain meth lab materials leftover from the DTO.   I believe this for two reasons.: First, I know from training and experience that when a DTO abandons a particular location in response to law enforcement action, they do not always remove all previous evidence of drug trafficking, often leaving behind items that do not hold significant monetary value to the organization..   Second, previously in this investigation when law enforcement action was taken, the DTO appeared to suspend activity inside the **Subject Property** for a lengthy period before returning.[4] In fact, during the September 22, 2023 search, it appeared the DTO had done just that, yet law enforcement still found evidence at the **Subject Property** as described above.

15.    The Subject Property is owned by E.A. Pando Investments LLC, which is in turn

---

[4]    For example, after the DTO used the **Subject Property** on July 11, 2023, for a liquid meth delivery, they did not us the **Subject Property** for another delivery until November 10, 2023.   During which time, the DTO used a separate location to transfer liquid meth from the black semi-truck to the Oklahoma City portion of the DTO. This gap appears to have coincided with some perceived pressure the DTO was feeling from law enforcement including an approximate ninety-two kilogram seizure of crystal meth.

owned by Ever Pando (Pando).   Having recently discovered that Pando had listed the **Subject Property** on his website as available to rent soon, law enforcement intends to execute this search warrant and retrieve its previously installed recording devices from the **Subject Property** prior to Pando renting the **Subject Property** to third parties.

16.    In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 90 days after the end of the execution (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705.  This is an ongoing investigation that involves several subjects, including Pando.  It is anticipated that this investigation may continue for several more weeks.   Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.   Many of the subjects have strong ties to Mexico.  In short, providing immediate notice following law enforcement's execution of this search warrant would jeopardize the investigation.

17.    Given that law enforcement is seeking to covertly retrieve its recording equipment that was previously installed pursuant to the Court's authorization, it is also requesting authorization to execute this warrant at any time in the day or night, as it believes that execution during the night offers the best chance of retrieving said equipment undetected.

## CONCLUSION

18.    Based on the foregoing, I respectfully submit that there is probable cause to

11

believe that evidence relating to violations of 21 U.S.C. §§ 841(a)(1) and 846 will be found at the **Subject Property**. I therefore respectfully request issuance of search warrants for the **Subject Property** (as set forth in **Attachment A**) based on the above-mentioned facts.

**FURTHER, YOUR AFFIANT SAYETH NOT.**

MICHAEL ADAMS
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 22nd day of February, 2024.

SUZANNE MITCHELL
United States Magistrate Judge

12

## Attachment A

**The Subject Property**
701 SE 29th Street, Oklahoma City, Oklahoma 73129



**Description:**

The **Subject Property** is an over-5,000 square-foot metal building (cream in color) that sits on the northeast corner of SE 29th Street and S Lindsay Avenue in Oklahoma City.  A large parking lot extends across the south end of the building and to the east. The front, or south side of the building, has three, white garage bay doors, one of which is taller than the other two. The front of the building also has one small window and a white door, with "701" printed on it, that opens into an enclosed office space on the southeast corner of the metal building.  Inside the office is access to a bathroom and to the rest of the warehouse space. The only other significant structure inside the warehouse appears to be a commercial grade paint booth.  The back, or the north side of the building, has one additional white garage bay door and another white exterior door.

**Attachment B**

**ITEMS TO BE SEIZED**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (manufacturing, distribution, and/or possession with intent to distribute, controlled substances) and 21 U.S.C. § 846 (conspiracy to do the same), namely:

1.  Illegal controlled substances, and items showing the illegal manufacturing and distribution of controlled substances, including, but not limited to, crystal methamphetamine, liquid methamphetamine, propane tanks, chemicals (i.e. Acetone), pots, personal protective equipment, scales, baggies, hoses, pumps, buckets, drums, or any other equipment/materials used in the manufacturing and packaging of illegal drugs.

2.  Documents, records, or materials related to the distribution of illegal drugs, including, but not limited to: ledgers, address books, telephone books, telephone bills, telephone records, rent receipts, rental car agreements, mini-storage receipts, cellular telephone agreements, pager rental agreements, bills and receipts related to cellular telephones and pagers, and any property and/or U.S. currency being proceeds of or related to the distribution of illegal narcotics. Also ledgers containing quantity of narcotics possessed, ledgers of money owed to the suspects for narcotics they have provided to co-conspirators, ledgers of money owed by the suspects to their suppliers, transportation and distribution instructions for the narcotics being sold, and other types of documentation regarding the sale of narcotics.

3.  Financial documents evidencing the illegal distribution of controlled substances, including, but not limited to: bank statements, bank deposit slips, canceled checks, money orders, money order receipts, wire transfer receipts, stored value cards, handwritten notes depicting monies owed for illegal controlled substances,

1

documents showing purported income, and any other evidence showing monetary records of the illegal distribution of controlled substances.

4. Documents, records, or materials related to the laundering of money, including, but not limited to: wire transfer receipts, bank deposit slips, bank withdraw slips, money order receipts, records detailing the purchase of property, items which show control of real property placed in nominee names such as utility payment records, property tax payment records, key to real property, receipts from payment of insurance premiums paid on residences/vehicle.

5. The fruits and proceeds of the illegal distribution of controlled substances, including, but not limited to: large amounts of currency, financial instruments and other items of value showing the spending of large sums of money made from engaging in the illegal distribution of controlled substances, or other illegal activities.

6. Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

    a. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

        i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail

2

contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.    evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.    passwords, encryption keys, and other access devices that may be necessary to access the device;

vii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies,

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

b.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

c.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, cellphones, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

7.    Items which tend to show dominion and control of the property searched, including, but not limited to, utility bills, telephone bills, correspondence, rental agreements, property tax payment records, receipt from the payment of insurance premiums on the residence, and other identification documents.

8.    Law enforcement will recover previously installed FBI equipment used for the interception of oral communication and the monitoring and recording of visual, non-verbal conduct.